IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 08-522 |
| NEXUS TECHNOLOGIES, INC. | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

For nearly a decade, defendant Nexus Technologies, Inc. ("Nexus") paid bribes to multiple Vietnamese government officials in exchange for contracts. Nexus did not slowly fall into bribery in order to compete - bribery was Nexus' business model. Nexus not only paid bribes on every contract it won, it offered a bribe on every contract on which it even submitted a bid. In exchange, Nexus secured valuable negotiating advantages as well as government contracts on which it did not provide the best equipment or the lowest bid. From the beginning, Nexus operated with a criminal purpose - to make money by paying off government officials. Nexus had a simple but effective mechanism for paying the bribes – bid amounts were calculated to include enough money to pay the bribes, so that the ultimate bribe money was charged back to the Vietnamese government itself once a bid was accepted, taking money away from the public fisc of one of the poorest nations in the world. As a result, the people of Vietnam paid for Nexus' criminal operations. Nexus then covered its tracks by laundering the bribe money through an off-shore company, falsifying invoices, and cooking its books.

Vietnam is a poor country that is struggling to overcome a severe economic crisis caused in part by government corruption. The Vietnamese government has, in recent years,

launched a significant effort to clean up that corruption, and it is working together with the United States to combat corruption, as well as to promote, protect, and support legitimate American business in Vietnam. Nonetheless, Nexus never even attempted to operate legally or to seek the assistance of the United States Commercial Service to secure contracts. Instead, Nexus greedily chose to bypass legitimate business options and exploit Vietnam's vulnerabilities by bribing its government officials in exchange for contracts. This is especially troubling because Nexus specialized in contracts to provide particularly sensitive technology to Vietnam, including computer systems, air traffic control systems, underwater mapping equipment, and bomb detection equipment – devices which should have been vetted, purchased, and provided on the basis of quality and price, without the taint and influence of bribes.

In the end, Nexus paid bribes totaling more than $689,000 over a period of more than nine years. It is impossible to determine how much Nexus offered in bribes in that time. Nexus engaged in no commerce whatsoever untainted by bribery. For all of the above reasons, as well as the other factors discussed below, the government recommends that the Court require Nexus to cease operations and turn over its assets to the Court.

I.  **BACKGROUND**

Nexus Technologies, Inc., a company incorporated in Pennsylvania with offices in Philadelphia and Vietnam, supplies equipment and technology to government agencies in Vietnam. Nexus does not manufacture the equipment and technology, but matches U.S. products with the specifications of tenders issued in Vietnam. At various times, Nexus had approximately ten employees in the United States and Vietnam. Nexus specializes in areas of industry that are state-controlled in Vietnam, including the areas of public security, petroleum, power generation,

civil aviation, and marine-related industries. As such, Nexus's customers are largely, if not entirely, government agencies and instrumentalities within Vietnam.

On March 16, 2010, Nexus pled guilty to the entirety of the Superseding Indictment: conspiracy to violate the Foreign Corrupt Practices Act ("FCPA"), to violate the Travel Act, and money laundering, in violation of 18 U.S.C. § 371 (Count One); violating the FCPA, 15 U.S.C. § 78dd-2 (Counts Two through Ten); violating the Travel Act, 18 U.S.C. § 1952(a)(3) (Counts Eleven through Nineteen); and money laundering in violation of 18 U.S.C. § 1956(a)(2)(A) (Counts Twenty through Twenty-Eight). The plea agreement provides that the defendant agrees that Nexus operated primarily by criminal means and the appropriate fine is to divest the organization of all its net assets pursuant to U.S.S.G. § 8C1.1. During the plea colloquy, the defendant admitted that it paid bribes and caused bribes to be paid to Vietnamese government officials in an effort to obtain and retain business.[1] Nexus also admitted that it hid the bribes, including the creation of falsified paperwork and funneling the bribe-payments through an off-shore account to hide their origin and purpose.

## II. SENTENCING CALCULATION

### A. Statutory Maximum Sentences

The defendant faces the following maximum possible sentences: (a) Count One (Conspiracy), a fine not exceeding $500,000 or twice the gross pecuniary gain or gross pecuniary

---

[1] Contrary to arguments made by counsel regarding the presentencing report, Nam Nguyen, President and owner of Nexus, also admitted that the director of T&T Co. Ltd., Nguyen Van Tan, identified in the superseding indictment as Official A, was a foreign government official under the Foreign Corrupt Practices Act. In addition, during interviews with the FBI on May 30, 2008, Nam Nguyen himself admitted that T&T Co. Ltd. is an instrumentality of the Vietnamese Ministry of Public Security.

loss resulting from the offense, whichever is greatest, five years' probation, and a mandatory special assessment of $400; (b) Counts Two through Ten (FCPA), a fine of $2,000,000 or twice the gross pecuniary gain or gross pecuniary loss resulting from the offense, whichever is greatest, five years' probation, and a mandatory special assessment of $400 per count; (c) Counts Eleven through Nineteen (Travel Act), a fine not exceeding $500,000 or twice the pecuniary gain or gross pecuniary loss resulting from the offense, whichever is greatest, five years' probation, and a mandatory special assessment of $400 per count; and (d) Counts Twenty through Twenty-Eight (money laundering), a fine not exceeding $500,000 or twice the value of the funds involved in the transfer, whichever is greatest, five years' probation, and a mandatory $400 special assessment per count.

The Total Possible Maximum Sentence is a fine of $28,378,232.08, a five-year period of probation, and an $11,200 special assessment.

### B. Sentencing Guidelines Calculation

The government agrees with the Sentencing Guidelines calculation in the PSR and stipulated in the plea agreement. Nexus operated primarily by criminal means and the appropriate fine is to divest the organization of all its net assets pursuant to U.S.S.G. § 8C1.1. Because Nexus agreed as a condition of its plea to cease all operations, probation is likely to be unnecessary, as Nexus will have ceased to exist.

### III. ANALYSIS

The Third Circuit has set forth a three-step process which the district courts must follow in compliance with the Supreme Court's ruling in United States v. Booker, 543 U.S. 220 (2005):

> (1) Courts must continue to calculate a defendant's Guidelines sentence precisely as they would have before Booker.
>
> (2) In doing so, they must formally rule on the motions of both parties and state on the record whether they are granting a departure and how that departure affects the Guidelines calculation, and take into account our Circuit's pre-Booker case law, which continues to have advisory force.
>
> (3) Finally, they are to exercise their discretion by considering the relevant § 3553(a) factors in setting the sentence they impose regardless whether it varies from the sentence calculated under the Guidelines.

United States v. Gunter, 462 F.3d 237, 247 (3d Cir. 2006) (quotation marks, brackets, and citations omitted) (citing United States v. King, 454 F.3d 187, 194, 196 (3d Cir.2006); United States v. Cooper, 437 F.3d 324, 329-30 (3d Cir. 2006)). See also United States v. Smalley, 517 F.3d 208, 211 (3d Cir. 2008) (stating that the Gunter directive is consistent with later Supreme Court decisions). In calculating the guideline range, this Court must make findings pertinent to the guideline calculation by applying the preponderance of the evidence standard, in the same fashion as was employed prior to the Booker decision. United States v. Grier, 475 F.3d 556 (3d Cir. 2007) (en banc). The failure to properly calculate the advisory guideline range will rarely be harmless error. United States v. Langford, 516 F.3d 205, 214-18 (3d Cir. 2008).

At the third step of the sentencing process, the Court must consider the advisory guideline range along with all the pertinent considerations of sentencing outlined in 18 U.S.C. § 3553(a) in determining the final sentence. "The record must demonstrate the trial court gave meaningful consideration to the § 3553(a) factors. . . . [A] rote statement of the § 3553(a) factors should not suffice if at sentencing either the defendant or the prosecution properly raises 'a ground of recognized legal merit (provided it has a factual basis)' and the court fails to address it." Cooper, 437 F.3d at 329. See also Rita v. United States, 127 S. Ct. 2456, 2468 (2007)

("The sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority."); United States v. Schweitzer, 454 F.3d 197, 205-06 (3d Cir. 2006).

Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).[2] In this case, consideration of the 3553(a) factors supports a significant sentence of incarceration within the advisory guideline range.

First, these offenses were very serious ones. By way of explanation, the FCPA was enacted by Congress in 1977 (and amended in 1988) to combat corruption harmful to foreign economies and governments, to enhance the United States' public image worldwide, and to allow

---

[2] Further, the "parsimony provision" of Section 3553(a) states that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." The Third Circuit has held that "district judges are not required by the parsimony provision to routinely state that the sentence imposed is the minimum sentence necessary to achieve the purposes set forth in § 3553(a)(2). . . . '[W]e do not think that the "not greater than necessary" language requires as a general matter that a judge, having explained why a sentence has been chosen, also explain why some lighter sentence is inadequate.'" United States v. Dragon, 471 F.3d 501, 506 (3d Cir. 2006) (quoting United States v. Navedo-Concepcion, 450 F.3d 54, 58 (1st Cir. 2006)).

legitimate businesses to compete against corrupt businesses. Revelations of bribery by American businesses, the Senate's investigation determined, had produced:

> severe adverse effects. Foreign governments friendly to the United States in Japan, Italy, and the Netherlands have come under intense pressure from their own people. <u>The image of American democracy abroad has been tarnished. . . . Corporate bribery is bad business</u>. In our free market system it is basic that the sale of products should take place on the basis of price, quality, and service. Corporate bribery is fundamentally destructive of this basic tenet. Corporate bribery of foreign officials takes place primarily to assist corporations in gaining business. <u>Thus foreign corporate bribery affects the very stability of overseas business. Foreign corporate bribes also affect our domestic competitive climate when domestic firms engage in such practices as a substitute for healthy competition for foreign business.</u> Managements which resort to corporate bribery and the falsification of records to enhance their business reveal a lack of confidence about themselves. Secretary of the Treasury Blumenthal, in appearing before the committee in support of the criminalization of foreign corporate bribery testified that: '<u>paying bribes – apart from being morally repugnant and illegal in most countries – is simply not necessary for the successful conduct of business here or overseas.</u>' The committee concurs in Secretary Blumenthal's judgment. Many U.S. firms have taken a strong stand against paying foreign bribes and are still able to compete in international trade. <u>Unfortunately, the reputation and image of all U.S. businessmen has been tarnished by the activities of a sizable number, but by no means a majority of American firms. A strong antibribery law is urgently needed to bring these corrupt practices to a halt and to restore public confidence in the integrity of the American business system.</u>

S. Rep. No. 95-114 (1977) at 3-4, <u>reprinted</u> in 1977 U.S.C.C.A.N. 4098 (emphasis added).

Since its passage, the FCPA has been at the forefront of a spreading international norm that has now been adopted in most developed countries to level the playing field for legitimate businesses. Prohibitions against bribery of foreign officials in international business transactions have been made binding through international conventions sponsored by the United Nations, the Council of Europe, the Organization for Economic Cooperation and Development, and the Organization of American States, and through the policies of other multilateral institutions like the World Bank and the International Chamber of Commerce. <u>See</u> Stuart H. Deming, <u>The Foreign Corrupt Practices Act and the New International Norms</u> (American Bar

Association Section of International Law 2005), at 93-94. As discussed above in footnote 2, the Sentencing Commission's 2002 change in treatment of the FCPA to the punitive public corruption guideline implemented the mandate of one such international treaty to which the United States is party to provide serious punishment equivalent to sentences in domestic bribery cases.

The point of these anti-bribery laws is that sound government decisions can only be made by honest, unbiased procurement officials. Thus, those who would excuse a business committing bribery of a foreign official as simply adhering to a developing country's "local business custom" are fundamentally wrong. Such a statement not only shows a lack of respect for U.S. and international law, but also expresses a cultural condescension toward foreign nationalities. Most important, the assertion is false – contradicted by the anti-bribery laws on foreign countries' books, by their public institutions specifically organized to combat corruption, by the public protests of their citizens against official corruption, and by their interference of scandal with the growth of democratic institutions. Vietnam is no exception. Recognizing the problems caused by past government corruption in Vietnam, in recent years the country has pursued a high-visibility campaign to end corruption. Not only have laws been passed to increase fiscal transparency in public management, but corruption involving more than a few thousand dollars is now punishable in Vietnam <u>with the death penalty</u>. Combating global corruption is a high priority for the United States, Vietnam, and the international community at large.

At sentencing, the government will present the testimony of Brent Omdahl, the former U.S. Commercial Attaché to the U.S. embassy in Vietnam. Mr. Omdahl is prepared to

testify about the nature and structure of the Vietnamese economy, including the role of state-owned enterprises and government ownership, control, and centrality to the government of Vietnam of extractive industry operations. He will further testify about the engagement of U.S. businesses in the Vietnamese economy and the role of the U.S. Commercial Service in assisting such U.S. businesses, including, but not limited to, the Commercial Service's interactions with representatives of Nexus. Finally, Mr. Omdahl is prepared to explain the use, operation, and government control of procurement arms, entering into contracts on behalf of the Vietnamese Ministry of Defense and Ministry of Public Security, including the use of brokers acting at the direction of, under the control of, and on behalf of, those ministries. As Mr. Omdahl will make clear, American businesses could and did legitimately, legally, and successfully operate in Vietnam <u>without</u> bribing Vietnamese government officials.

Further, while any bribery of a foreign government official by an American hurts our international reputation and relations, Nexus' systematic bribery was particularly egregious. Vietnam is one of the poorest countries in the world, with a per-capita income of less just over $1,000 per year, according to the U.S. Department of State.[3] Vietnam relies on the exploitation of its natural resources by companies like PetroVietnam Gas Company and VietSovPetro to fuel its economy and fund public services. Nexus' other clients provided critical public safety services. Just the substantive bribes to which Nexus pled guilty represent the yearly income of more than 200 Vietnamese citizens, the equivalent of a $75,000,000 bribe in the United States, funded at direct cost to the Vietnamese public.

---

[3] "Background Note: Vietnam," available at www.state.gov/r/pa/ei/bgn/4130.htm. Figure is for 2009.

Moreover, this is not a case of an isolated incident. This is not a case of providing officials with gift baskets or entertainment that crossed some fine line. Nexus' executives were fully aware of the FCPA and that the company had been set up to systematically violate it. Nor is this a case of a defendant finding one corrupt government official and taking advantage of the situation. In this instance, Nexus' conduct continued for almost a decade and touched many different Vietnamese government agencies. In essence, Nexus systematically embezzled a developing country's public funds by acting as an accomplice to various Vietnamese public officials' theft of money from a wide range of agencies, all while depriving other potential legitimate bidders of business opportunities. Because Nexus never operated legitimately, in keeping with the Sentencing Guidelines, it should no longer exist and termination of the company's operations and a deprivation of all its ill-gotten gains is the appropriate sentence, precisely because of the scale, scope, and potential harm of this offense conduct.[4]

Nexus' knowledge of the wrongfulness of his conduct also contributes to the serious nature of these crimes. Nexus concealed its criminal activities, including: (1) funneling the bribe payments through a Hong Kong bank account belonging to a company that was controlled by Nam Nguyen and Nexus Technologies; (2) falsified paperwork; and (3) efforts to disguise the bribe payments in Nexus books and records.

The need for this sentence to promote general deterrence is also particularly strong here. A company created solely to participate in corrupt procurement schemes should not be

---

[4] The Supreme Court has declared: "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 128 S. Ct. 586, 596 (2007). Thus, the Sentencing Guidelines remain an indispensable resource for assuring appropriate and uniform punishment for federal criminal offenses.

permitted to continue its existence. Nexus responded to the knowledge that it was engaged in criminal activity not with obedience to the law, but by adopting methods to avoid detection. To the extent that conduct such as defendants' is in fact not unique in the U.S. business community, it will hardly be deterred by sending the message that the consequence of such conduct is a minor fine. On the other hand, word that violation of the FCPA can result in a company being put out of business demonstrates that bribery and its fines are not merely the cost of doing business, but that deliberately exploiting corruption in procurement out of greed, at the risk of health and safety of the citizens the officials should be protecting, is a crime that never pays.

Unlike many cases where a deterrent effect of a sentence is more theoretical, this case has appropriately garnered the attention of many in Vietnam and the U.S. corporate and legal communities who will now see how Nexus is actually punished after conviction of these charges.

## IV. CONCLUSION

Companies who do business in foreign countries must see that foreign bribery is a serious crime with serious consequences, especially when accompanied by money laundering and Travel Act violations. The government respectfully submits that only the termination of Nexus' operations and divestment of all its net assets will adequately deter others in this industry from committing similar crimes, will punish Nexus sufficiently for its criminal conduct, will sufficiently promote respect for the law and for U.S. treaty obligations, and will advance all of the other goals of sentencing.

For all of the above reasons, the government recommends a sentence of imprisonment within the advisory guidelines range.

Respectfully submitted,

ZANE DAVID MEMEGER
United States Attorney

JENNIFER ARBITTIER WILLIAMS
Assistant United States Attorney

DENIS J. MCINERNEY
Chief, Fraud Section
Criminal Division, Department of Justice

KATHLEEN M HAMANN
Anticorruption Policy Counsel and Trial Attorney
Fraud Section, Criminal Division
Department of Justice

CERTIFICATE OF SERVICE

I hereby certify that on this date I caused a true and correct copy of the foregoing Government's Sentencing Memorandum to be served by e-mail upon the following:

Defense Counsel

Catherine M. Recker, Esquire
Amy B. Carver, Esquire
Welsh & Recker, P.C.
2000 Market Street
Suite 2903
Philadelphia, PA 19103

Daniel J. Tann, Esquire
Law Offices of Daniel J. Tann
1420 Walnut Street
Suite 1012
Philadelphia, PA 19102

Jeffrey M. Miller, Esquire
Nasuti and Miller
The Public Ledger Building, Suite 1064
150 South Independence Mall West
Philadelphia, PA 19106

Michael J. Engle, Esquire
1600 Market Street
Suite 2650
Philadelphia, PA 19103

Probation Officer

Mark B. Hassinger
Senior U.S. Probation Officer
U.S. Probation Office, E.D. Pa.
600 Arch Street
Suite 2400
Philadelphia, PA 19106

KATHLEEN M HAMANN
Anticorruption Policy Counsel and Trial Attorney

Date: September 8, 2010